NOTICE
Decision filed 02/11/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250781-U

NOS. 5-25-0781 and 5-25-0782, cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* SHAYLA T. and JADA T., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 25-JA-16, 25-JA-17 |
| | ) | |
| William T., | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The dispositional order of the circuit court of Vermilion County that adjudicated the minors to be neglected and made them wards of the court was not against the manifest weight of the evidence.

¶ 2    Following a dispositional hearing, the court adjudicated Shayla T. and Jada T. wards of the court and appointed the Department of Children and Family Services (DCFS) as their guardian. William T., the respondent and father of the minors, appeals, arguing that the circuit court erred by adjudicating them neglected. We disagree and affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     On February 24, 2025, the State filed a petition for adjudication of wardship for Jada T., born February 2021 and Shayla T., born August 2022 alleging that the minors are neglected in that they were under the age of 14 and left without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of the minors. 705 ILCS 405/2-3(1)(d) (West 2022). The matter proceeded to a shelter care hearing on February 25, 2025.

¶ 5     The respondent and the mother, Melissa C.,[1] were not present at the start of the hearing. The State proceeded by calling Kevin Puckett of DCFS to testify. Puckett stated that he was a DCFS investigator, and he responded to a call from the police department due to a hotline report, stating that the respondent and Melissa left the home without the children, securing the residence from the outside. When Puckett arrived, he observed some sort of cord on the exterior door of the home and the children inside the home. There were four children inside, aged five years old, four years old, three years old, and six months old, with no adults present.[2] The oldest child was attempting to care for the younger children, and the infant was in a swing. The children "had a bad smell to them" and the home was "kind of trashed" with flies everywhere. The parents later showed up as DCFS was taking protecting custody of the children, and both parents were arrested. Puckett testified that by the time the parents arrived, the children had been alone for at least an hour. Puckett also stated that he spoke to Melissa after she was arrested, and she stated that she went to buy some milk from the store and that she made a mistake. Further, Puckett stated that Melissa's history showed that a prior investigation into her was conducted the previous April for leaving the children unsupervised as well.

---

[1]Melissa is not a party on appeal. As such, facts about her will be limited.
[2]Two of the children had a different father from the children involved in the present case, so they are not included in the case on appeal.

¶ 6    The circuit court found that there was an immediate and urgent necessity to remove the children from the home as leaving the children in the home was contrary to their health, welfare, and safety due to being left without supervision for an unreasonable period of time and for the conditions within the home. The court then placed temporary custody of the children with the Guardianship Administrator of DCFS. A written order was entered the same day.

¶ 7    At the conclusion of the hearing, both parents appeared after being in the wrong courtroom. The court asked the respondent if he was the father of three of the children. The respondent confirmed that he was, but stated that no official DNA test had been completed, and that he did not sign their birth certificates or a voluntary acknowledgement of paternity. The court read the allegations of the petitions to the parents, as well as all the rights the parents had in the case, and told them to cooperate with DCFS and comply with any service plan. The court also appointed counsel. The court explained the shelter care hearing and its findings. The court also ordered a DNA test for the respondent. The respondent completed a drug screen the same day, which tested positive for methamphetamine and THC.

¶ 8    An adjudicatory hearing took place on April 30, 2025. The respondent was present with counsel. At the beginning of the hearing, Melissa's counsel indicated that there was an admission in this case, and the respondent's counsel stated that the respondent would be willing to stipulate to the neglect with the understanding that he was not the perpetrator because the parties did not reside together. The court questioned whether the respondent resided there because the report stated that the mother and father left the children, but the respondent stated that he denied being present at the home when the report was made.

¶ 9    The parties indicated that Melissa was admitting to the allegations of neglect, and the respondent would stipulate. The court explained to the respondent that this meant that "the Court,

3

based upon a parent's admission or stipulation that children are neglected or abused, *** does make a finding that the children are neglected. The Court makes a finding that the neglect is or was occasioned by, caused by one or both of the parents." The court further explained that both parents may be required to engage in services if DCFS determines them to be necessary, even if only one party admitted to the neglect. The respondent confirmed that he understood.

¶ 10    The court then questioned the respondent, with the respondent stating that he was 39 years old, completed school through the eleventh grade, had learning disabilities, took medication for his anxiety, was not under the influence of any drugs or alcohol, and he believed that he was thinking clearly and able to make decisions.

¶ 11    The court detailed the information contained in the petitions, alleging that the children were neglected for being left unsupervised for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of the children. The court again explained the rights and responsibilities of the respondent in this case moving forward in order to cooperate with DCFS. The respondent confirmed that he understood everything the court told him. The court then asked the parties if they reached an agreement that Melissa would admit and the respondent would stipulate to the facts alleged in the petition, to which the parties stated they agreed. As part of the agreement, the State would not use Melissa's admission as evidence against her in any criminal proceeding, and the State agreed not to file a petition to terminate parental rights for at least nine months, so long as the parties remain in contact with DCFS. The respondent confirmed that he understood the terms of the agreement, and that nothing other than the stated terms had been promised to him in order to enter into the agreement. The respondent stated that he entered into the agreement freely and voluntarily. The State then provided the factual basis, which was described at the initial hearing.

4

¶ 12 The court accepted the factual basis and asked the respondent if he wanted to have the agreement accepted, to which he said "yes." The court then asked, "Then do you stipulate or agree that to your knowledge, the facts as alleged in each of the petitions in these cases are true?" to which the respondent stated, "That—but I was not there though. I just want you to know I was not there." The respondent confirmed that the facts were true. The court then accepted the respondent's stipulation, finding that it was freely, voluntarily, and knowingly entered. The court directed the parties to cooperate with the agencies and complete any evaluations or services deemed necessary. The court entered a written adjudicatory order the same day.

¶ 13 On June 24, 2025, the Center for Youth and Family Solutions (CYFS) filed a dispositional report. The report detailed the hotline phone call report that caused DCFS's involvement in the case, in that four children under the age of five were left unattended at a home with a "bungie and electrical chord [*sic*] apparatus in the back door area to help keep the children inside of the house." The respondent did not complete the integrated assessment, and the report noted that he needed to cooperate with CYFS and continue with visitation.

¶ 14 On June 26, 2025, the circuit court held a dispositional hearing. All the parties agreed to stipulate to the report filed by CYFS and presented no further evidence. The State asked that the children be adjudicated neglected and that custody and guardianship be awarded to the Guardianship Administrator of DCFS to place the children. The State asked that the respondent cooperate with an integrated assessment and follow any recommendations from the assessment and participate in visitation. During the hearing, the respondent's counsel stated, "[The respondent] doesn't wish to participate in the case. He wishes to appeal the finding of neglect."

¶ 15 The circuit court found that it was consistent with the health, welfare, and safety of the children and in their best interests to be made wards of the court. Further, for reasons other than

financial circumstances alone, each parent was unfit, unable to care for, protect, train, educate, supervise, or discipline the children. Reasonable efforts by the parents had been made, but they had not eliminated the necessity for removal. The petitions were granted, the children were adjudicated neglected, and each child was made a ward of the court with custody and guardianship placed with the Guardianship Administrator of DCFS. The circuit court entered a written dispositional order the same day.

¶ 16    On July 28, 2025, the respondent filed a motion to withdraw stipulation and to vacate adjudication. The motion alleged that the respondent did not understand the terms of the stipulation. Because of his learning disabilities, the stipulation was not knowingly and voluntarily made.

¶ 17    On September 24, 2025, CYFS filed a permanency report. The report stated that the respondent completed an integrated assessment since the last hearing. He needed to complete a substance abuse assessment, as he tested positive for marijuana, methamphetamine, and amphetamines. He additionally needed to complete individual counseling and parenting education. The respondent participated in visitation with the children, and the DNA test showed that he was the father of Shayla and Jada.

¶ 18    On September 26, 2025, the matter was set for a permanency review, and the court addressed the motion to withdraw the respondent's stipulation. The respondent's counsel stated,

> "I think there is a transcript on file, which indicates that [the respondent] didn't really understand what he was doing at the time and agreed to a stipulation and he wanted to make it clear that he was not involved in the alleged act of neglect. He wasn't in the home at the time the children were left unattended."

The court confirmed that this statement was already a part of the record at the time of the stipulation. The State responded, saying that the admonishments and discussion during the adjudicatory hearing were sufficient to show that the respondent "understood the admission he was making" and that the motion should be denied.

¶ 19    The court stated that the respondent stipulated during the April 30, 2025, adjudicatory hearing and during the dispositional hearing on June 26, 2025, the respondent did not raise the issue of not understanding the stipulation. The allegations in the petitions were based upon conduct that Melissa admitted and contained no indication that the respondent was a participant in leaving the children without supervision for an unreasonable period of time. When the respondent stipulated to the petition, it was made clear to the court that the respondent was not a participant and the "adjudication in this case could well have been entered based upon the mother's admission only."

¶ 20    The court stated that the respondent was admonished about the significance of the admission from Melissa, and he still stipulated. The court said, "Nothing in the record, other than the motion itself, supports a finding that the [respondent's] stipulation was not made knowingly and voluntarily." The court denied the motion to vacate the stipulation and adjudication. After the ruling, the respondent's counsel stated that the respondent asked him to file a notice of appeal "because he doesn't want this on his background."

¶ 21    The parties then stipulated to the permanency report filed, and the court found that the goal remained return home, but the respondent did not make reasonable or substantial progress, or reasonable efforts toward the goal of return home. The court told the respondent of the services he needed to complete. Custody and guardianship remained with DCFS. The respondent timely appealed on September 30, 2025.

7

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, the respondent argues that the circuit court erred in finding the children to be neglected and making them wards of the court. The respondent's brief does not address the motion to withdraw stipulation but instead argues that the State failed to prove that the "children were neglected by" the respondent.

¶ 24    The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) provides a step-by-step process to be used in determining whether a child should be removed from his or her parents and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). Upon the filing of a petition for wardship by the State, the Act provides that a temporary custody hearing shall be held during which the court shall determine whether there is probable cause to believe that the child is neglected, whether there is an immediate and urgent necessity to remove the child from the home, and whether reasonable efforts have been made to prevent the removal of the child or that no efforts reasonably can be made to prevent or eliminate the necessity of removal. 705 ILCS 405/2-10 (West 2024).

¶ 25    Following placement of a child in temporary custody, the circuit court must make a finding of abuse, neglect, or dependence before it conducts an adjudication of wardship. *Id*. § 2-21; *In re N.B.*, 191 Ill. 2d 338, 343 (2000). Section 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)) defines a "neglected minor" to include "any minor under 18 years of age whose environment is injurious to his or her welfare." *Id*. In general, the term "injurious environment" has been interpreted to include "the breach of a parent's duty to ensure a 'safe and nurturing shelter' for his or her children." *In re N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995). Accordingly, cases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances. *In re Arthur H*., 212 Ill. 2d at 463.

8

¶ 26 At a proceeding for adjudication of wardship, the State must prove the allegations of neglect by a preponderance of the evidence. *In re Arthur H.*, 212 Ill. 2d at 463-64. In other words, the State must establish that the allegations of neglect are more probably true than not. *Id.* at 464. The circuit court's findings regarding wardship and fitness at the dispositional hearing stage are given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006); *In re T.B.*, 215 Ill. App. 3d 1059, 1061 (1991). A circuit court's determination of wardship or fitness will be reversed "only if the factual findings are against the manifest weight of the evidence." *In re Kamesha J.*, 364 Ill. App. 3d 785, 795 (2006). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re C.N.*, 196 Ill. 2d 181, 208 (2001).

¶ 27 On appeal, the respondent argues that the State failed to prove that the children were neglected by the respondent. Specifically, "[e]vidence was presented that the mother left the children alone in the home. No evidence was presented that [the respondent] was present at the time of this incident." The short argument section of the respondent's brief focuses solely on the fact that the children were not neglected *by him*, so the finding of neglect and subsequent dispositional order should be vacated.

¶ 28 The legislature has stated that the purpose of an adjudicatory hearing is "to determine whether the allegations of a petition *** that a minor under 18 years of age is *** neglected *** are supported by a preponderance of the evidence." 705 ILCS 405/1-3(1) (West 2024); *In re Arthur H.*, 212 Ill. 2d at 465. During the adjudicatory hearing, the court hears evidence on the State's petition for adjudication to determine if the minor is abused, neglected, or dependent based on that evidence. *In re Zion M.*, 2015 IL App (1st) 15119, ¶ 23.

"The plain language of this provision instructs the circuit court to focus solely upon whether the child has been neglected. The legislature made no mention in this provision that during the adjudicatory stage of the proceedings the circuit court is also to determine who may be responsible for the child's neglect, and to assess the proportion of blame with respect to such individuals.

* * *

There is no direction from the legislature that the court shall consider the actions of the parents in making this determination." *In re Arthur H.*, 212 Ill. 2d at 465-66.

A court may find a child neglected at the adjudicatory stage without finding that both parents engaged in neglect. *Id*. at 465-67.

¶ 29　While the respondent focuses on the fact that Melissa neglected the children and that he did not actively neglect them, this argument is misplaced as the purpose of the adjudicatory hearing is to determine whether the children are neglected, not to determine the "blame" of each parent. *Id.* In the present case, Melissa admitted that she "made a mistake" and left the children home alone. The circuit court stated that Melissa's admission alone would be sufficient to adjudicate the children neglected. See *In re R.B.*, 336 Ill. App. 3d 606, 616 ("A custodial parent's admission and stipulation, *by itself*, may be sufficient to support a finding of abuse or neglect." (Emphasis in original.)). On appeal, the respondent's brief states, "[e]vidence was presented that the mother left the children alone in the home," which is the evidence the court relied upon when adjudicating the children neglected. As such, it was not against the manifest weight of the evidence to adjudicate the children neglected.

¶ 30　In addition to Melissa's admission, the respondent stipulated to the facts of the petition. At the circuit court level, the respondent argued that this stipulation was not made knowingly and

intelligently due to his learning disabilities. However, the record rebuts this argument because the circuit court sufficiently detailed to the respondent the meaning of the stipulation, and he confirmed he understood what the stipulation meant. He does not further this argument on appeal and would be estopped from doing so. See *In re R.W.*, 2025 IL App (4th) 241614-U, ¶ 14 (finding that appellant would be barred from challenging the neglect finding on appeal due to the doctrine of invited error after stipulating to the allegations).

¶ 31    If the circuit court determines that the minor is abused, neglected, or dependent, then the matter proceeds to a dispositional hearing at which it determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2024). "The purpose of a dispositional hearing is not to terminate parental rights." *In re April C.*, 326 Ill. App. 3d 225, 237 (2001). Rather,

> "a dispositional hearing serves the purpose of allowing the circuit court to decide what further actions are in the best interests of a minor, and the hearing and ruling on whether to make a minor a ward of the court gives the parents 'fair notice of what they must do to retain their rights to their child' in the face of any future termination proceedings." *Id.*

"Though the court, when making the wardship determination, considers the specific parent's capability to care for the child, *** the wardship determination is based on the best interest to the child when considering the totality of the circumstances surrounding the child's life." *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15. A trial court's dispositional decision regarding a minor rests within its discretion and will not be overturned unless it is against the manifest weight of the evidence. *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009).

11

¶ 32    While the respondent's brief states that the circuit court erred in making the children wards of the court and the dispositional order should be vacated, he does not raise any issues from the dispositional hearing or about the stipulated dispositional report. In fact, at the time of the dispositional hearing, the respondent had not completed the integrated assessment and reported that he would not participate in the case. Given that the respondent stipulated to the report during the hearing, presented no further evidence, and made no specific arguments on appeal, the respondent is asking this court to review the same evidence the circuit court had to consider and reach a different result. Based on our review of the record and the evidence presented, including the dispositional report, an opposite conclusion than that of the circuit court is not clearly apparent. Therefore, we will not substitute our judgment for that of the circuit court.

¶ 33                              III. CONCLUSION

¶ 34    For the foregoing reasons, we affirm the June 26, 2025, dispositional order of the Vermilion County circuit court.

¶ 35    Affirmed.